J-S17006-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KAIJIN XAVIER SCOTT | : | |
| | : | |
| Appellant | : | No. 634 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 22, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004375-2018

BEFORE: LAZARUS, J., OLSON, J., and KING, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED: JUNE 12, 2023**

Kaijin Xavier Scott appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, after he was convicted by a jury of second-degree murder,[1] robbery,[2] conspiracy to commit robbery,[3] and tampering with/fabricating physical evidence.[4] After careful review, we affirm.

Scott was charged as a co-conspirator in the February 22, 2018 shooting death of Keiauna Davis. Scott's co-conspirator, Dane Taylor, fatally shot Davis after struggling with her to steal her purse. Scott drove the get-away car

_____

[1] 18 Pa.C.S.A. § 2502(b).

[2] *Id.* at § 3701.

[3] *Id.* at § 903.

[4] *Id.* at § 4910(1).

after Taylor shot the victim twice. The trial court recounted the underlying facts of the alleged conspiracy as follows:

> [O]n the morning of February 22, 2018, Keiauna Davis was working at the Dollar General store in Wilkinsburg. This was one of two jobs held by [] Davis, who was a single mother to two children under the age of six. During her shift, Ms. Davis's grandmother, Linda Wilson, delivered [cash in the amount of] approximately $3,000[.00] to her, which represented her tax return. []Davis, who relied on public transportation or family members to drive her to and from work, was planning to shop for a car after work that day and to buy party supplies for her daughter's upcoming birthday.
>
> Laya Whitley, who only started working at the Dollar General the day before, became aware of this money and texted Dane Taylor of the same. The text exchanges were presented through several exhibits and were read [into the record] by Allegheny County Police Detective Laurie McKee. On February 22, 2018[,] the following exchange occurred:
>
> > Whitley: "Guess what?" (11:25 a.m.)
> >
> > Taylor: "Wat." (11:31 a.m.)
> >
> > Whitley: "This girl at my job brought 7 bands to work. Ain't that some shit?" (11:31 a.m.)
> >
> > Taylor: "It's a go. Delete all dez [sic] texts." (12:48 p.m.)
> >
> > Whitley: "They been gone." (1:26 p.m.)
> >
> > Taylor: "Ite" (1:27 p.m.)
>
> Each of these messages from Whitley's phone showed evidence of having been deleted.
>
> Shortly after Whitely told Taylor about [] Davis's money, phone records offered at trial established that [Scott] and Taylor began communicating. The phone records for [] Whitley, [] Taylor, and [Scott] revealed the date and time of the communications but not the content.
>
> These exhibits illustrated that a call was placed by Taylor to [Scott] on February 22, 2018[,] at 12:01 p.m.[,] lasting one

minute and nineteen seconds; followed by a call from [Scott] to Taylor at 12:03 p.m. The records evidenced two more calls from [Scott] to Taylor at 1:55 p.m. and again at 2:29 p.m. [Scott] and Taylor also communicated by text message a total of 18 times between 12:00 p.m. and 2:30 p.m.

Video surveillance from inside the Dollar General showed that [] Davis secured the money in the [m]anager's office during her shift, and later retrieved the money along with her personal belongings at the end of her shift. She then proceeded to the counter to make some purchases at the register manned by Whitley. [Scott], who had already picked up [] Taylor, was parked in the rear lot of the Dollar General. Exterior surveillance footage then shows [] Davis exit at 2:36 p.m. Thereafter, [Scott] and Taylor leave the parking lot and drive onto Laketon Avenue. The events that followed, including [] Davis walking on Laketon Avenue, up to and including her murder, were captured on a residential surveillance camera. The entire event, beginning when [Scott] parked the vehicle until he drove away from the scene, was less than one minute.

[Scott] and Taylor knew who [] Davis was based on the physical description provided by [] Whitley. Therefore, once they located her walking on Laketon Avenue, [Scott] drove past her, and parked the car along the sidewalk. [Scott] then exited the car and bent down near the rear driver's side tire. As [] Davis walked alongside the passenger side of the vehicle, Taylor open[ed] the front passenger door and jump[ed] out of the car. [] Davis immediately r[an] and [wa]s chased by Taylor into an abandoned lot where she physically struggle[d] with him over her purse. At this time, [] Davis is on the ground with Taylor standing over her, and [Scott] is standing in the street beside the vehicle. After several seconds of wrestling over the purse to no avail, Taylor sho[t] at [] Davis two times. The first shot missed, and the second shot struck her in the right hip, later resulting in her death. At the time of the shooting, [Scott] quickly moved to the front of the vehicle and then seconds later he walked back to the driver's door and reentered the car.

Surveillance continued to capture the events which showed Taylor take the purse from a now[-]injured [] Davis. Taylor can be seen running back to the car at which time he tossed the purse inside through the open passenger door to [Scott], who [wa]s now seated in the driver's seat. Taylor then returned to the location of [] Davis to retrieve an item which was later determined to be

- 3 -

his phone. As Taylor entered the passenger door, the purse [wa]s thrown out of the open door by [Scott] and [wa]s caught on a nearby tree, where it was later retrieved by police. [Scott] immediately drove away from the scene with Taylor as [] Davis continued to struggle on the ground, having been critically wounded by the gunshot. The surveillance footage recorded [] Davis's last living moments as she crawled to the sidewalk and attempted to wave at passing cars for help. Eventually, a passerby stopped and called for help as evidenced by the response of both police and EMS at the scene. [] Davis was transported to a local hospital[,] where she was pronounced dead at 3:39 p.m. on February 22, 2018.

At trial[,] the Commonwealth presented testimony from Dr. Todd Luckasevic, a forensic pathologist with the Allegheny County Office of the Medical Examiner. He testified that [] Davis, a 27-year-old African American female, died from a gunshot wound to her pelvis. D[octor] Luckasevic stated that the bullet entered through the outside of her right thigh. He described it as a contact wound, directing the jury to the photographic evidence which showed soot on her skin, as well as a muzzle imprint abrasion, and an abrasion consistent with the recoil spring of a firearm. He explained to the jury that the bullet took a trajectory from right to left and back to front, severing two major arteries and fracturing her hip bone before exiting out her inner thigh.

Following the homicide, [Scott] and Taylor were captured on video arriving at 2215 Wilner Drive, the residence of [] Whitley.

The next day, on February 23, 2018, the vehicle operated by [Scott] was recovered in Penn Hills. This same day, police made contact with [Scott] at his residence in Turtle Creek and he indicated he wished to talk with Allegheny County detectives who were investigating the homicide of [] Davis. County detectives responded to [Scott's] residence, and he voluntarily accompanied the detectives to Allegheny County police headquarters for an interview. The nine-hour interview was recorded and played for the jury.

During the course of the interview[, Scott's] statements as to the events of February 22, 2018[,] changed multiple times. Initially, he told police that he gave a jitney ride to an unknown person. Then [Scott] stated that during the drive to the Dollar General in Wilkinsburg, he learned that this individual knew both [Scott's] brother and mother and went by the name "D Low." [Scott] stated

- 4 -

that after arriving at the location, "D Low" robbed him at gunpoint, and continued to keep him at gunpoint as he threatened to hurt [Scott's] mother if [Scott] didn't do what he said. [Scott] told detectives that it was out of fear for his life and his mother's, that he complied with the step-by-step instructions given by "D Low" regarding where to drive and what to do. [Scott] stated that "D Low" directed him to drive past [] Davis who was walking on the sidewalk, and then park along the street ahead of her. [Scott] was then ordered out of the car by Taylor and told to pretend that he was having car trouble. As [] Davis walked by the passenger door, "D Low" got out of the car and began to struggle with Ms. Davis over her purse. During the struggle, [Scott] heard two gunshots. The first did not strike [] Davis but the second one did. "D Low" then removed the purse from [] Davis, ran back to the car, threw the purse inside, and ordered [Scott] to "get it," which [Scott] assumed meant money. At "D Low's" instruction, [Scott] then threw the purse out of the vehicle and drove away with "D Low" in the car. Still under "D Low's" direction, [Scott] drove a few blocks away where he then dropped off "D Low." Prior to exiting the vehicle, "D Low" made another threat against [Scott's] mother. From there, [Scott] re-counted that he drove to his residence in Turtle Creek and then downtown to get his phone fixed.

[Scott's] story then shifted as to how he initially encountered "D Low," who he still maintained he did not know. He now explained that he was looking to buy marijuana when he came across "D Low" and that their interaction then turned into a jitney ride. He maintained[,] however[,] that his actions once they got to the Dollar General were all forced under gunpoint.

Several hours into the interview police began talking about [] Whitley, prompting another revision by [Scott] as to the events of February 22, 2018. He now admitted that the person he drove to the Dollar General was not a stranger, or a person known as "D Low," but a man named "H.D." He also divulged he knew the purpose of the trip to the Dollar General was to allow "H.D." to get money, and disclosed that a girl inside the store told "H.D" that a female co-worker with red hair had $7,000. [Scott] also admitted that he had contact with "H.D." after the shooting. Specifically, that he picked up "H.D." that night and took him to Whitley's residence in the East Hills section of Pittsburgh and messaged with "H.D." through Facebook.

A forensic download of [Scott's] phone confirmed these Facebook messages[,] which occurred from 7:23 p.m. on February 22, 2018[,] through 1:13 p.m. on February 23, 2018. Throughout the messaging[, Scott] and Taylor refer to each other as "bro," ""homie," "dude[,]" and "cuhs," which [i]s known [to be] short for ["]cousin.["] The initial message came from [Scott] asking Taylor what he was doing. The two messaged about someone who died in Wilkinsburg, referencing a single mom. [Scott] also stated that[] "she was cute" and "lmao" which stands for "laughing my ass off." Taylor responded that [Scott] is disgusting and "lol" which stands for "laughing out loud." Taylor messaged [Scott] that he heard that the [police] had the car color but not the plate and [Scott] referenced that the story was on the news. The two continued to talk about football and splitting a jitney to go out that night. The messages ceased around 10:21 p.m. on February 22, 2018[,] and resumed in the early morning hours of February 23, 2018, when Taylor messaged [Scott] that he, "[p]assed out and woke up early." They then engaged in talks about what they were doing that morning. At 10:40 a.m., [Scott] messaged Taylor that the police were at his house [and told] Taylor that he had been robbed the night before and was scared. The records revealed that Taylor continued to message [Scott] between 11:21 a.m. until 1:13 p.m., with no response from [Scott].

At this time and day, 1:13 p.m. on February 23, 2018, [Scott] was at Allegheny County headquarters[,] where his recitation of the events of February 22, 2018[,] continued to evolve. Police asked [Scott] if he received any money from the robbery and he pointedly denied that he had. However, this statement quickly changed. First, he disclosed that he was offered money but refused it. Shortly thereafter, he admitted that there was $700-$800 in a bag located in a bedroom closet, however it was H.D.'s money that [Scott] was instructed to keep at his house and not touch.

During the interview [Scott] agreed to give police his cell phone and his password to allow for a forensic download. From this download, a string of text messages w[as] discovered between [Scott] and Whitley that occurred after the murder on February 22, 2018[,] between 6:06 p.m. and 6:13 p.m.

[Scott]: "It's Rod Drey." "How are you doing?" (6:06 p.m.)

Whitley: "Lol. I am ite. Where you from?" (6:11 p.m.)

[Scott]: "Homewood. Where you from?" (6:12 p.m.)

Whitley: "I'm from the hill G block to be exact. Lol. And I say show b-c that my second hood." (6:12 p.m.)

[Scott]: "Lol. I see. WYM. (Known as "what you mean") That is cool doe. How old are you?" (6:12 p.m.)

During the investigation police returned to [Scott's] residence in Turtle Creek[,] where they encountered his girlfriend[,] India McDonald. [] McDonald lived with [Scott] and provided police with consent to search the residence. During the search, police seized two cell phones that were subsequently submitted for a forensic download. Afterward, detectives transported [] McDonald to her parents' residence in Wilkinsburg. During the ride [] McDonald advised them that she had money she wanted to turn over to the police. [] McDonald then entered her parents' residence and returned to the detective's vehicle with $669. She explained that she was giving it to them because she received it from [Scott], who told her it was proceeds from a robbery that had been committed the night before.

At trial, [Scott] testified on his own behalf. He stated that he accepted a Facebook request from [] Taylor for a jitney ride, explaining that he knew of him peripherally because Taylor was friends with Scott's brother and that his nickname was H.D. He described exchanging multiple phone calls and text messages with Taylor prior to picking him up on Ray Street in Wilkinsburg. After picking him up, Taylor told him to drive to the Dollar General store and to back into a parking spot in the back lot. [Scott] then left the car to urinate outside an abandoned building while Taylor remained inside the vehicle. When [Scott] returned to the car, Taylor was now wearing a face mask and had a gun out and ordered [Scott] to shut the door. According to [Scott], Taylor told him that he needed this money and that [Scott] was going to do what he said. Although [Scott] described that Taylor was aiming the gun in his direction, he denied that he was being held at gunpoint. Despite telling the jury he was not under threat, [Scott] testified he did what Taylor wanted and repeatedly asked him not to shoot him.

[Scott] testified that he exited the parking lot. At this time[,] Taylor instructed him to drive past the female with red hair and park along the street. [There]after, [Scott] was ordered out of the car and instructed to act like he was fixing something on the car. According to [Scott], Taylor threatened to shoot [Scott] if he tried to run away. [Scott] felt like his life was in danger and told

the jury he did as he was instructed. Consistent with the video evidence, [Scott] described that Taylor jumped out of the car as [] Davis walked by and immediately began to tussle with her over her purse. [Scott] then heard one gunshot and started to run towards the victim when a second gunshot stopped him in his tracks. [Scott] got back into the car at Taylor's instruction. Taylor then threw the purse at him and ordered him to take out the money. [Scott] removed the money and then threw the purse out the window.[5] [Scott] explained that Taylor still had the gun out when he told [Scott] to drive away, further instructing him to drive to [Scott's] house. Once inside the house, Taylor, who was still holding the gun, ordered [Scott] to hide some of the money upstairs. [Scott] told the jury that Taylor followed him upstairs and watched him hide the money in a closet. Taylor then told [Scott] where to drop him off and threatened to "off" him and his brother if he called the police. [Scott] explained that it was fear for himself and his family that kept him from calling 911 or the police. He described how he then drove around for a bit when he remembered that he needed to go downtown and pick up his phone. Thereafter[, Scott] received a call from Taylor demanding that [Scott] come pick him up. [Scott] complied and drove Taylor to the East Hills residence of [] Whitley. [Scott] maintained that he had never met Whitely prior to this. He said that they exchanged telephone numbers because he wanted to make sure he had Whitley's phone number so if he talked to the police he could give them her information. He further explained that he messaged with Taylor after the shooting, as part of a plan he and his wife concocted in an effort to get Taylor to his house so they could call the police.

[Scott] admitted on cross[-]examination that he was not truthful with the detectives during his interview when he denied knowing [] Taylor, however, he continued to deny any advanced knowledge that Taylor was going to rob [] Davis.

_____

[5] Video footage shows Scott throw the victim's purse out of the open passenger-side door and into a nearby tree. The court found that Scott's actions supported the jury's verdict that Scott discarded the victim's purse with the intent to prevent its accessibility for any future investigation, resulting in Scott's conviction for tampering with evidence. Critically, Scott testified at trial that he threw the victim's purse to get rid of it because he was concerned it may have had his DNA and/or fingerprints on it. N.T. Jury Trial, 8/26/21, at 409-10.

[Scott] also offered three character witnesses[,] who testified that [Scott] had a good reputation for peacefulness and non-violence in the community.

Trial Court Opinion, 10/4/22, at 3-13.

After a five-day jury trial held in August 2021, Scott was found guilty of the above-stated offenses. On November 22, 2021, the court sentenced Scott to a mandatory sentence of life imprisonment for murder, 6-12 years of imprisonment for robbery, and 6½ -13 years of imprisonment for conspiracy.[6] The court ran the sentences consecutively, for an aggregate sentence of life, plus 12½ -25 years' imprisonment. Scott filed a timely post-sentence motion and an amended *nunc pro tunc*[7] post-sentence motion challenging the sufficiency and weight of the evidence. On April 25, 2022, the trial court denied the motion.

Scott filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following issues for our consideration:

(1)   Did the trial court abuse its discretion in excluding statements made by [] Taylor that he forced Scott to participate in the robbery of the victim where those statements implicated Taylor in the crimes against the victim and crimes against Scott, and where they [were] made under circumstances clearly corroborating their trustworthiness and, thus, were admissible statements against interest pursuant to Pa.R.E. 804(b)(3)?

_____

[6] No further penalty was imposed on the tampering conviction.

[7] Scott requested, and the trial court granted him, leave to file an amended/supplemental post-sentence motion *nunc pro tunc*. **See** Order, 1/4/22.

(2)     Was the evidence at trial insufficient to support Scott's convictions for second-degree murder, robbery, and conspiracy to commit robbery because the evidence was in equipoise as to whether [it] required speculation to conclude that Scott intended to rob, aided the robbery of, or agreed to rob [] the victim, as opposed to being Taylor's unwitting and subsequently threat-compelled pawn?

Appellant's Brief, at 4.

In his first issue, Scott contends that the trial court erred in not admitting evidence of statements that Taylor made to a fellow inmate, David Tyus, that would have been admissible as a statement against Taylor's penal interest. **See** Pa.R.E. 804(b)(3).

Under the rules of evidence,

> **Statement Against Interest** — A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declaration to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. **In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.**

Pa.R.E. 804(b)(3) (emphasis added). **See also Commonwealth v. Bracero**, 528 A.2d 936, 941 (Pa. 1987) (plurality opinion) (holding "declarations against penal interest are admissible as an exception to the hearsay rule only when there are circumstances that provide clear assurance that such declarations are trustworthy and reliable").

Instantly, Tyus testified that in 2018 he was cellmates in the Allegheny County Jail with Taylor, whom he referred to as "Gusto." Tyus testified that

Taylor wrote down what occurred during the instant robbery and shooting, indicating that Scott had no intent to rob the victim. Taylor asked Tyus to give Scott this note, but Tyus explained that he did not know Scott at the time Taylor relayed this information to him. Tyus later changed cells in jail and was placed near Scott but never gave him the note, having thrown it away several months before he relocated cells.

Tyus also testified that, at some point later in time, Taylor authored and gave to Tyus a second note, which Tyus did give to Scott. That second note also indicated that Scott did not intend to rob the victim. The defense, however, was unable to produce this second note at the evidentiary hearing. *See* N.T. Hearing, 8/26/21, at 500 ("[T]hat note is unavailable, Your Honor."). Tyus, however, claimed he wrote a four-page letter detailing what Taylor had told him in August of 2018 and mailed it to Scott's mother. Scott sought to have Tyus testify to the substance of what was in the letter— that, in fact, Taylor told him that he was solely responsible for robbing and killing the victim, and that Scott was unaware of the robbery plan.

In August 2021, the trial court held a hearing, outside the presence of the jury, on Scott's request to admit Tyus' four-page letter from August 2018 and to have Tyus testify regarding conversations he had with Taylor in jail. Taylor invoked his Fifth Amendment privilege and was deemed unavailable. *See* Pa.R.E. 804(b)(3). Ultimately, the court excluded the proposed testimony on the basis that it did not deem the statements trustworthy or reliable due to the circumstances under which they were made. ***Commonwealth v.***

*Colon*, 846 A.2d 747 (Pa. Super. 2004). Specifically, the court determined that "there are no assurances of reliability to the jailhouse statement Dane Taylor made to fellow inmate David Tyus" where:

- There is no corroborative evidence to establish reliability of statement;
- Both alleged notes Taylor wrote were no longer available;
- Statements were made while Taylor was incarcerated and not spontaneously after robbery and homicide;
- There is nothing self-incriminatory about statements; and
- Statements would have been uncorroborated hearsay as Taylor not subject to examination under oath about any claim that Scott did not participate in robbery.

Trial Court Opinion, 10/4/22, at 22.

In *Commonwealth v. Robins*, 812 A.2d 514 (Pa. 2002), our Supreme Court noted "that in every circumstance where the admission of testimony pursuant to this [hearsay] exception is considered, corroboration independent of the statement itself is necessary." *Id.* at 525. With regard to factors that may be helpful in determining whether a statement is independently corroborated, the *Robins* Court reiterated:

> [C]ourts have evaluated: the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's

- 12 -

relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

*Id.* at 526-27.

We agree with the trial court that the evidence is inadmissible due to its lack of independent corroboration where Taylor's notes were unavailable or had been thrown away, *see* N.T. Hearing, 8/26/21, at 500, no one witnessed Tyus write or send his four-page letter to Scott's mother, *id.* at 503; the defense had no proof that Tyus ever mailed the letter to Scott's mother, *id.*; the information in Tyus' letter and Taylor's statements were "100 percent [] opposite to all of the testimony that [was] present[ed] during the course of the trial," *id.* at 505-06; and the information does not inculpate Taylor. *Id.* at 506.[8] *Bracero*, *supra*.

In his next issue, Scott contends the evidence was insufficient to prove that he was guilty of second-degree murder, robbery, and conspiracy to commit robbery.[9] Specifically, Scott asserts that the evidence presented at trial to prove that he "was an intentional participant in the plot [to rob the

_____

[8] We note that the court also found the evidence inadmissible on the grounds that a declarant's exculpatory statement with regard to an accomplice is not considered a statement against interest. *Commonwealth v. Colon*, 337 A.2d 554, 558 (Pa. 1975).

[9] Scott has abandoned any claim as to the sufficiency or weight of the evidence with regard to his tampering with evidence conviction as he has failed to argue it in his appellate brief. *See* Pa.R.A.P. 2119(a), (b) (requiring properly developed argument for each question presented including a discussion of and citation to authorities in appellate brief); *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1262 (Pa. Super. 2014) (en banc) (failure to conform to Rules of Appellate Procedure results in waiver of the underlying issue).

victim], rather than an unwitting and, later, threat-compelled pawn," Appellant's Brief, at 13, was speculative at best. "In short, the Commonwealth's failure to provide any evidence about how Scott came to participate in the robbery leaves a hole in its case as to whether he intended to do so, or, rather, was Taylor's threat[-]compelled instrument." *Id.* at 31. We disagree.

In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Randall*, 758 A.2d 669, 674 (Pa. Super. 2000).

After reviewing the parties' briefs, the relevant case law, and the evidence of record, we rely upon the well-written opinion, authored by the Honorable Bruce R. Beemer, to dispose of Scott's sufficiency of the evidence claims on appeal. *See* Trial Court Opinion, 10/4/22, at 22-34. The evidence established, beyond a reasonable doubt, the elements for second-degree murder, robbery, and conspiracy. We instruct the parties to attach a copy of Judge Beemer's decision in the event of further proceedings in the matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/12/2023

# Allegheny County - Department of Court Records
## Criminal Division - Filings Information

County caseID:CP-02-CR-0004375-2018(Opinion)
Case Description: COMMONWEALTH OF PENNSYLVANIA v. LNAME SCOTT

**Official Docket Entry, Sort By Document Number Ascending**

| Document Number | Title/Entry | Filing Date |
|---|---|---|
| 1 | OPINION | 10/04/2022 |

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

v.

KAIJIN XAVIER SCOTT

Appellant,

CP-02-CR-0004375-2018

634 WDA 2022

OPINION
JUDGE BRUCE R. BEEMER

Copies served by first class mail to:

Corrie Woods, Esq.
Woods Law Offices PLLC
200 Commerce Drive Ste 210
Moon Twp., PA 15108

Allegheny County District Attorney's
Office
Michael W. Streily, Esq.
401 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA 15219

☐ ORIGINAL

ALLEGHENY COUNTY, F.
CRIMINAL DIVISION
DEPT. OF COURT RECORDS

2022 OCT -4 PM 12: 46

FILED

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA          CP-02-CR-0004375-2018
                                      634 WDA 2022

v.

KAIJIN XAVIER SCOTT

Appellant,

## OPINION

**BRUCE R. BEEMER, J.**

Appellant, Kaijin Scott, appeals from the judgment of sentence order imposed after a jury trial wherein he was found guilty of Murder of the Second Degree, 18 Pa.C.S. § 2502(B); Robbery, 18 Pa.C.S. § 3701; Conspiracy (Robbery), 18 Pa.C.S. § 903; and Tampering with or Fabricating Physical Evidence, 18 Pa.C.S. § 4910(1).

The trial commenced on August 23, 2021. After a five-day trial, Appellant was convicted on August 27, 2021 of the charges referenced above. On November 22, 2021, the Court imposed a mandatory life sentence at Count 1, Murder of the Second Degree; 6-12 years of incarceration at Count 2, Robbery;[1] and at Count 3, Conspiracy (Robbery), a sentence of 6 ½ - 13 years of incarceration. The Court ran each count consecutively for an aggregate sentence of life in prison plus 12 ½ - 25 years.

---

[1] The sentence imposed at Count 2 Robbery was vacated during the post sentence motion hearing held on April 22, 2022, as it merged with Count 1. Amended Order of Sentence, April 22, 2022.

On December 2, 2022, Appellant filed a timely Post Sentence Motion with a request to supplement. Upon receiving a time extension, an Amended Post Sentence Motion was filed on March 3, 2022 challenging both the sufficiency and the weight of the evidence. The motion was denied on April 25, 2022.[2] A timely Notice of Appeal was filed on May 25, 2022, followed by a Concise Statement of Matters Complained of on Appeal (hereinafter Statement) on June 21, 2022. This Opinion follows.

## FACTUAL BACKGROUND

The majority of evidence adduced at trial was uncontested by Appellant, including that he was present at the time co-conspirator Dane Taylor[3] shot and killed Keiauna Davis on February 22, 2018.[4] Appellant's dispute with the Commonwealth's case centered around the reasons and circumstances for his actions.

The Commonwealth presented evidence regarding the events leading up to Davis's death through various witnesses. Collectively, they testified that on the morning of February 22, 2018, Keiauna Davis was working at the Dollar General store in Wilkinsburg. This was one of two jobs held by Ms. Davis, who was a single mother to two children under the age of six.[5] During her shift, Ms. Davis's grandmother, Linda Wilson, delivered approximately $3,000 to her, which

---

[2] The April 25, 2022 order was timely inasmuch as the Court granted Appellant's March 8, 2022 Motion for Extension of Time to rule on the Amended Post Sentence Motion.

[3] Dane Taylor was charged in connection with the death of Keiauna Davis at CP-02-CR-0004793-2018. On July 16, 2019, Dane Taylor entered a guilty plea to Murder of the Third Degree, 18 Pa.C.S. §2502(c); Robbery, 18 Pa.C.S. §3701(a)(1)(i); Conspiracy (Robbery), 18 Pa.C.S. §903; and Violations of the Uniform Firearms Act (VUFA), 18 Pa.C.S. §6106. He was sentenced in accordance with a negotiated agreement to a period of 30-60 years of incarceration. A post sentence motion was filed and subsequently denied by operation of law on July 28, 2020. On November 10, 2020 Taylor filed a PCRA petition. After an evidentiary hearing held on November 22, 2021, the Court issued an order denying the PCRA petition on February 17, 2022. No direct appeal was filed.

[4] Jury Trial Transcript, (J.T.) August 23, 2021 – August 27, 2021, 57-64, 96-97, 548, 563.

[5] J.T. at 69.

3

represented her tax return.[6] Ms. Davis, who relied on public transportation or family members to drive her to and from work, was planning to shop for a car after work that day and to buy party supplies for her daughter's upcoming birthday.[7]

Laya Whitley[8], who only started working at the Dollar General the day before, became aware of this money and texted Dane Taylor of the same.[9] The text exchanges were presented through several exhibits and were read by Allegheny County Police Detective Laurie McKeel.[10] On February 22, 2018 the following exchange occurred:

Whitley: "Guess what?" (11:25 a.m.)

Taylor: "Wat." (11:31 a.m.)

Whitley: "This girl at my job brought 7 bands to work. Ain't that some shit?" (11:31 a.m.)

Taylor: "It's a go. Delete all dez texts." (12:48 p.m.)

Whitley: "They been gone." (1:26 p.m.)

Taylor "Ite" (1:27 p.m.)

Each of these messages from Whitley's phone showed evidence of having been deleted.[11]

Shortly after Whitely told Taylor about Ms. Davis's money, phone records offered at trial established that Appellant and Taylor began communicating.[12] The phone records for Laya

---

[6] J.T. at 68, 70-72, 82.

[7] J.T. at 69-73, 82.

[8] Laya Whitley was charged in connection with the death of Keiauna Davis at CP-02-CR-0004374-2018. On July 16, 2019, Whitley entered a guilty plea to Murder of the Third Degree, 18 Pa.C.S. §2502(c); Robbery, 18 Pa.C.S. §3701(a)(1)(i); Conspiracy (Robbery), 18 Pa.C.S. §903; Criminal use of Communication Facility, 18 Pa.C.S. §7512(a) and Tampering with evidence, 18 Pa.C.S. §4910 (1). She was sentenced in accordance with a negotiated agreement to a period of 20-50 years of incarceration. No post sentence motion or direct appeal were filed. On March 25, 2020 Whitley filed a PCRA petition. The denial of her PCRA petition was appealed and affirmed by the Pennsylvania Superior Court. *Commonwealth v. Whitley*, 273 A.3d 1051 (Pa. Super. 2022); 850 WDA 2021. A Petition for Allowance of Appeal was denied on July 5, 2022; 91 WAL 2022.

[9] J.T. at 79.

[10] J.T. at 266- 272; Commonwealth Exhibit 41, 42, 45-51.

[11] J.T. at 270-272.

[12] J.T. at 313-316; Commonwealth Exhibit 60.

4

Whitley, Dane Taylor, and Appellant, revealed the date and time of the communications but not the content.[13]

These exhibits illustrated that a call was placed by Taylor to Appellant on February 22, 2018 at 12:01 p.m. lasting one minute and nineteen seconds; followed by a call from Appellant to Taylor at 12:03 p.m. The records evidenced two more calls from Appellant to Taylor at 1:55 p.m. and again at 2:29 p.m. Appellant and Taylor also communicated by text message a total of 18 times between 12:00 p.m. and 2:30 p.m.[14]

Video surveillance from inside the Dollar General showed that Ms. Davis secured the money in the Manager's office during her shift, and later retrieved the money along with her personal belongings at the end of her shift.[15] She then proceeded to the counter to make some purchases at the register manned by Whitley.[16] Appellant, who had already picked up Dane Taylor, was parked in the rear lot of the Dollar General. Exterior surveillance footage then shows Keiauna Davis exit at 2:36 p.m.[17] Thereafter, Appellant and Taylor leave the parking lot and drive onto Laketon Avenue. The events that followed, including Ms. Davis walking on Laketon Avenue, up to and including her murder, were captured on a residential surveillance camera.[18] The entire event, beginning when Appellant parked the vehicle until he drove away from the scene, was less than one minute.[19]

Appellant and Taylor knew who Keiauna Davis was based on the physical description provided by Laya Whitley. Therefore, once they located her walking on Laketon Avenue, Appellant drove past her, and parked the car along the sidewalk. Appellant then exited the car

---

[13] J.T at 312-314; Commonwealth Exhibits 57-60.
[14] J.T. at 318-322.
[15] J.T. at 82, 90-92; Commonwealth Exhibit 1.
[16] J.T. at 91-92.
[17] J.T. at 91.
[18] J.T. at 144-148; Commonwealth Exhibit 2 (audio not available).
[19] Commonwealth Exhibit 2, (Time Stamp (T.S.) 6:41-7:36).

and bent down near the rear driver's side tire. As Ms. Davis walked alongside the passenger side of the vehicle, Taylor opens the front passenger door and jumps out of the car. Ms. Davis immediately runs and is chased by Taylor into an abandoned lot where she physically struggles with him over her purse. At this time, Ms. Davis is on the ground with Taylor standing over her, and Appellant is standing in the street beside the vehicle. After several seconds of wrestling over the purse to no avail, Taylor shoots at Ms. Davis two times. The first shot missed, and the second shot struck her in the right hip, later resulting in her death. At the time of the shooting, Appellant quickly moved to the front of the vehicle and then seconds later he walked back to the driver's door and reentered the car.

Surveillance continued to capture the events which showed Taylor take the purse from a now injured Keiauna Davis. Taylor can be seen running back to the car at which time he tossed the purse inside through the open passenger door to Appellant, who is now seated in the driver's seat. Taylor then returned to the location of Ms. Davis to retrieve an item which was later determined to be his phone. As Taylor entered the passenger door, the purse is thrown out of the open door by Appellant and is caught on a nearby tree, where it was later retrieved by police.[20] Appellant immediately drove away from the scene with Taylor as Ms. Davis continued to struggle on the ground, having been critically wounded by the gunshot. The surveillance footage recorded Ms. Davis's last living moments as she crawled to the sidewalk and attempted to wave at passing cars for help. Eventually, a passerby stopped and called for help as evidenced by the response of both police and EMS at the scene. Ms. Davis was transported to a local hospital where she was pronounced dead at 3:39 p.m. on February 22, 2018.[21]

---

[20] J.T. at 171; Commonwealth Exhibit 18 and 19.
[21] J.T. at 151.

6

At trial the Commonwealth presented testimony from Dr. Todd Luckasevic, a forensic pathologist with the Allegheny County Office of the Medical Examiner. He testified that Keiauna Davis, a 27-year-old African American female, died from a gunshot wound to her pelvis.[22] Dr. Luckasevic stated that the bullet entered through the outside of her right thigh. He described it as a contact wound, directing the jury to the photographic evidence which showed soot on her skin, as well as a muzzle imprint abrasion, and an abrasion consistent with the recoil spring of a firearm.[23] He explained to the jury that the bullet took a trajectory from right to left and back to front, severing two major arteries and fracturing her hip bone before exiting out her inner thigh.[24]

Following the homicide, Appellant and Taylor were captured on video arriving at 2215 Wilner Drive, the residence of Laya Whitley.[25]

The next day, on February 23, 2018, the vehicle operated by Appellant was recovered in Penn Hills. This same day, police made contact with Appellant at his residence in Turtle Creek and he indicated he wished to talk with Allegheny County detectives who were investigating the homicide of Ms. Davis.[26] County detectives responded to Appellant's residence, and he voluntarily accompanied the detectives to Allegheny County police headquarters for an interview.[27] The nine-hour interview was recorded and played for the jury.[28]

During the course of the interview Appellant's statements as to the events of February 22, 2018 changed multiple times. Initially, he told police that he gave a jitney ride to an unknown

---

[22] J.T. at 232-234.
[23] J.T. at 227-229; Commonwealth Exhibit 31 and 32.
[24] J.T. at 229-234; Commonwealth Exhibit 33 and 34.
[25] Commonwealth Exhibit 38.
[26] J.T. at 178, 197.
[27] J.T. at 179-180.
[28] J.T. at 184-190, 199; Commonwealth Exhibit 27 and 28. By agreement the video was redacted to remove the arrest of Appellant and portions of the interview when police were not present.

7

person. Then Appellant stated that during the drive to the Dollar General in Wilkinsburg, he learned that this individual knew both Appellant's brother and mother and went by the name "D Low". Appellant stated that after arriving at the location, "D Low" robbed him at gunpoint, and continued to keep him at gunpoint as he threatened to hurt Appellant's mother if Appellant didn't do what he said.[29] Appellant told detectives that it was out of fear for his life and his mother's, that he complied with the step-by-step instructions given by "D Low" regarding where to drive and what to do.[30] Appellant stated that "D Low" directed him to drive past Ms. Davis who was walking on the sidewalk, and then park along the street ahead of her. Appellant was then ordered out of the car by Taylor and told to pretend that he was having car trouble.[31] As Ms. Davis walked by the passenger door, "D Low" got out of the car and began to struggle with Ms. Davis over her purse. During the struggle, Appellant heard two gunshots. The first did not strike Ms. Davis but the second one did. "D Low" then removed the purse from Ms. Davis, ran back to the car, threw the purse inside, and ordered Appellant to "get it", which Appellant assumed meant money. At "D Low's" instruction, Appellant then threw the purse out of the vehicle and drove away with "D Low" in the car.[32] Still under "D Low's" direction, Appellant drove a few blocks away where he then dropped off "D Low". Prior to exiting the vehicle, "D Low" made another threat against Appellant's mother. From there, Appellant re-counted that he drove to his residence in Turtle Creek and then downtown to get his phone fixed.[33]

Appellant's story then shifted as to how he initially encountered "D Low", who he still maintained he did not know. He now explained that he was looking to buy marijuana when he

[29] Exhibit 28, Time Stamp (T.S.) 12:33-12:40.
[30] T.S. 12:40-12:44.
[31] T.S. 12:40-12:42.
[32] T.S. 12:42-12:45.
[33] T.S. 12:45-12:48.

8

came across "D Low" and that their interaction then turned into a jitney ride.[34] He maintained however that his actions once they got to the Dollar General were all forced under gunpoint.[35]

Several hours into the interview police began talking about Laya Whitley, prompting another revision by Appellant as to the events of February 22, 2018. He now admitted that the person he drove to the Dollar General was not a stranger, or a person known as "D Low", but a man named "H.D." He also divulged he knew the purpose of the trip to the Dollar General was to allow "H.D." to get money, and disclosed that a girl inside the store told "H.D" that a female co-worker with red hair had $7,000.[36] Appellant also admitted that he had contact with "H.D" after the shooting. Specifically, that that he picked up "H.D." that night and took him to Whitely's residence in the East Hills section of Pittsburgh and messaged with "H.D." through Facebook.[37]

A forensic download of Appellant's phone confirmed these Facebook messages which occurred from 7:23 p.m. on February 22, 2018 through 1:13 p.m. on February 23, 2018.[38] Throughout the messaging Appellant and Taylor refer to each other as "bro", "homie", "dude" and "cuhs", which was known as short for cousin. The initial message came from Appellant asking Taylor what he was doing.[39] The two messaged about someone who died in Wilkinsburg, referencing a single mom. Appellant also stated that, "she was cute" and "lmao" which stands for "laughing my ass off".[40] Taylor responded that Appellant is disgusting and "lol" which stands for "laughing out loud".[41] Taylor messaged Appellant that he heard that they [police] had

---

[34] T.S. 1:06-1:08.
[35] T.S. 2:25-2:31.
[36] T.S. 3:38-3:54.
[37] T.S. 4:23-4:48.
[38] J.T. at 273, 275-291; Commonwealth Exhibit 52.
[39] J.T. at 275.
[40] J.T. at 279.
[41] J.T. at 279-280

9

the car color but not the plate and Appellant referenced that the story was on the news.[42] The two continued to talk about football and splitting a jitney to go out that night.[43] The messages ceased around 10:21 p.m. on February 22, 2018 and resumed in the early morning hours of February 23, 2018, when Taylor messaged Appellant that he, "[p]assed out and woke up early."[44] They then engaged in talks about what they were doing that morning. At 10:40 a.m., Appellant messaged Taylor that the police were at his house, informing Taylor that he had been robbed the night before and was scared.[45] The records revealed that Taylor continued to message Appellant between 11:21 a.m. until 1:13 p.m., with no response from Appellant.

At this time and day, 1:13 p.m. on February 23, 2018, Appellant was at Allegheny County headquarters where his recitation of the events of February 22, 2018 continued to evolve. Police asked Appellant if he received any money from the robbery and he pointedly denied that he had. However, this statement quickly changed. First, he disclosed that he was offered money but refused it. Shortly thereafter, he admitted that there was $700-$800 in a bag located in a bedroom closet, however it was H.D.'s money that Appellant was instructed to keep at his house and not touch.[46]

During the interview Appellant agreed to give police his cell phone and his password to allow for a forensic download.[47] From this download, a string of text messages were discovered between Appellant and Whitley that occurred after the murder on February 22, 2018 between 6:06 p.m. and 6:13 p.m..[48]

Appellant: "It's Rod Drey." "How are you doing?" (6:06 p.m.)

---

[42] J.T. at 280.
[43] J.T. at 284-285.
[44] J.T. at 286.
[45] J.T. at 289-291
[46] T.S. 4:55-4:58, 5:26-5:32, 5:53.
[47] J.T. at 190-191; Commonwealth Exhibit 29 and 30. Commonwealth Exhibit 28 (T.S. 1:09).
[48] J.T. at 292; Commonwealth Exhibit 53.

10

Whitley: "Lol. I am ite. Where you from?" (6:11 p.m.)

Appellant: "Homewood. Where you from?" (6:12 p.m.)

Whitley: "Im from the hill G block to be exact. Lol. And I say show b-c that my second hood." (6:12 p.m.)

Appellant: "Lol. I see. WYM. (Known as "what you mean") That is cool doe. How old are you?" (6:12 p.m.)

During the investigation police returned to Appellant's residence in Turtle Creek where they encountered his girlfriend India McDonald. Ms. McDonald lived with Appellant and provided police with consent to search the residence.[49] During the search, police seized two cell phones that were subsequently submitted for a forensic download.[50] Afterward, detectives transported Ms. McDonald to her parents' residence in Wilkinsburg. During the ride Ms. McDonald advised them that she had money she wanted to turn over to the police. Ms. McDonald then entered her parents' residence and returned to the detective's vehicle with $669. She explained that she was giving it to them because she received it from Appellant, who told her it was proceeds from a robbery that had been committed the night before.[51]

At trial, Appellant testified on his own behalf. He stated that he accepted a Facebook request from Dane Taylor for a jitney ride, explaining that he knew of him peripherally because Taylor was friends with Appellant's brother and that his nickname was H.D.[52] He described exchanging multiple phone calls and text messages with Taylor prior to picking him up on Ray Street in Wilkinsburg.[53] After picking him up, Taylor told him to drive to the Dollar General store and to back into a parking spot in the back lot.[54] Appellant then left the car to urinate

---

[49] J.T. 241.
[50] J.T. at 240-241.
[51] J.T. at 242-243, 249; Commonwealth Exhibit 39.
[52] J.T. at 392-394.
[53] J.T. at 394-397.
[54] J.T. at 397-399.

11

outside an abandoned building while Taylor remained inside the vehicle. When he returned to the car, Taylor was now wearing a face mask and had a gun out and ordered Appellant to shut the door.[55] According to Appellant, Taylor told him that he needed this money and that Appellant was going to do what he said. Although Appellant described that Taylor was aiming the gun in his direction, he denied that he was being held at gunpoint.[56] Despite telling the jury he was not under threat, Appellant testified he did what Taylor wanted and repeatedly asked him not to shoot him.[57]

Appellant testified that he exited the parking lot. At this time Taylor instructed him to drive past the female with red hair and park along the street. Whereafter, Appellant was ordered out of the car and instructed to act like he was fixing something on the car. According to Appellant, Taylor threatened to shoot Appellant if he tried to run away.[58] Appellant felt like his life was in danger and told the jury he did as he was instructed. Consistent with the video evidence, Appellant described that Taylor jumped out of the car as Ms. Davis walked by and immediately began to tussle with her over her purse. Appellant then heard one gunshot and started to run towards the victim when a second gunshot stopped him in his tracks.[59] Appellant got back into the car at Taylor's instruction. Taylor then threw the purse at him and ordered him to take out the money.[60] Appellant removed the money and then threw the purse out the window.[61] He explained that Taylor still had the gun out when he told him to drive away, further instructing him to drive to Appellant's house. Once inside the house, Taylor, who was still holding the gun, ordered Appellant to hide some of the money upstairs. Appellant told the jury

---

[55] J.T. at 399.
[56] J.T. at 400-401.
[57] J.T. at 404.
[58] J.T. at 403.
[59] J.T. at 407-408.
[60] J.T. at 409.
[61] J.T. at 409-410.

12

that Taylor followed him upstairs and watched him hide the money in a closet.[62] Taylor then told Appellant where to drop him off and threatened to "off" him and his brother if he called the police.[63] He explained that it was fear for himself and his family that kept him from calling 911 or the police.[64] He described how he then drove around for a bit when he remembered that he needed to go downtown and pick up his phone. Thereafter he received a call from Taylor demanding that Appellant come pick him up. Appellant complied and drove Taylor to the East Hills residence of Laya Whitley.[65] Appellant maintained that he had never met Whitely prior to this. He said that they exchanged telephone numbers because he wanted to make sure he had Whitley's phone number so if he talked to the police he could give them her information.[66] He further explained that he messaged with Taylor after the shooting, as part of a plan he and his wife concocted in an effort to get Taylor to his house so they could call the police.[67]

Appellant admitted on cross examination that he was not truthful with the detectives during his interview when he denied knowing Dane Taylor, however, he continued to deny any advanced knowledge that Taylor was going to rob Ms. Davis.[68]

Appellant also offered three character witnesses who testified that Appellant had a good reputation for peacefulness and non-violence in the community.[69]

---

[62] J.T. at 413-414.
[63] J.T. at 415.
[64] J.T. at 416.
[65] J.T. at 418.
[66] J.T. at 421-422.
[67] J.T. at 424-425, 516-517.
[68] J.T. at 441-470.
[69] J.T. at 333-336, 519-521, 522-524.

13

## MATTERS COMPLAINED OF ON APPEAL

Appellant raised seven claims of error in his Statement. The first two claims challenge the Court's ruling on the admissibility of evidence. Specifically, that the Court abused its discretion when it allowed admission of autopsy photographs because the prejudicial value outweighed the probative value. Next, that the Court erred when it denied admissibility of a statement made by Dane Taylor to a third party under Pa.R.E. 804(b)(3).

Appellant also challenges the sufficiency of the evidence for the convictions. He cites to *In the Interest of J.B.*, 189 A.3d 390 (Pa. 2018) in support of his argument that the Commonwealth's evidence was insufficient to establish the intent element for tampering with evidence, and in support of his global argument that the evidence was insufficient to show he acted as an accomplice or co-conspirator. Briefly, *J.B.* involved the conviction of a juvenile for the murder of his step-mother and her unborn child. When the Pennsylvania Supreme Court vacated J.B.'s adjudication for murder based on insufficient evidence, it reiterated the well-established precedent that when, "the trial evidence of record viewed in the light most favorable to the Commonwealth and all reasonable inferences drawn from that evidence is only, at most, equally consistent with a defendant's innocence as it is with his guilt, the Commonwealth has not sustained its burden of proving the defendant's guilt beyond a reasonable doubt." *Id.* at 415. Applying this standard to the facts in *J.B.*, the Court held that the evidence was insufficient to establish J.B's identity as the person who killed the victims because, "all reasonable inferences derived therefrom, viewed in a light most favorable to [the Commonwealth], was, at best, in equipoise", such that it was equally consistent with him being responsible for the commission of the crime as it was for an unknown third party.

14

Lastly, Appellant asserted that the Court erred when it denied his post sentence motion seeking a new trial wherein, he argued that the verdict was against the weight of the evidence.

## ADMISSIBILITY OF EVIDENCE

The Pennsylvania Rules of Evidence define "relevant evidence" as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" as long as "the fact is a consequence in determining the action." Pa.R.E. 401(a)-(b). Relevant evidence is admissible, and irrelevant evidence is inadmissible. *See* Pa.R.E. 402. Even relevant evidence may be excluded if its probative value is outweighed by prejudice. *See* Pa.R.E. 403.

The standard of review of a trial court's evidentiary rulings is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. *Commonwealth v. Hernandez*, 230 A.3d 480, 489 (Pa. Super. 2020) (internal citations omitted). An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. *Commonwealth v. Seilhammer*, 862 A.2d 1263, 1270 (Pa.Super. 2004).

Appellant's first evidentiary claim is that this Court erred and/or abused its discretion in admitting autopsy photographs, arguing that they lacked any significant probative value to any fact at issue. This claim surrounds the admissibility of seven photographs the Court permitted to be admitted and displayed to the jury during the course of testimony of the forensic pathologist, Dr. Todd Lukasevic. During an evidentiary hearing Appellant argued that the photographs had no probative value as the cause and manner of Ms. Davis' death was uncontested.[70] Thus, the

---

[70] J.T. at 97-98.

15

autopsy photos are inflammatory and are more prejudicial than probative. The Commonwealth countered the photos were probative and would assist the pathologist in describing his findings to the jury.[71]

If the Commonwealth offers photographic evidence depicting an autopsy the trial court should conduct a two-part analysis to determine whether the evidence is admissible. First, it should be determined whether the photograph is inflammatory. If it is not, then it may be admitted as long as it is relevant and may assist the jury in understanding a fact at issue. If the photograph is inflammatory, the court must then determine whether the picture is of such essential evidentiary value that the need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Murray*, 83 A.3d 137, 157 (Pa. 2013). A criminal homicide trial can be by its very nature unpleasant, and therefore a disturbing image of the victim should not be allowed to rule the question of admissibility. There is no need to overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. *Commonwealth v. Mollett*, 5 A.3d 291 (Pa.Super. 2010) (citing *Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003).

A trial court abuses its discretion if it is "indifferent" to the photograph's prejudicial effect, or any precaution taken is not commensurate with the nature of the scene depicted. *Commonwealth v. Ballard*, 80 A.3d 380, 393 (Pa. 2013). A photo should be excluded when it is in fact inflammatory and its probative value so limited as to be outweighed by the prejudice. See *Commonwealth v. LeGares*, 709 A.2d 922 (Pa. Super. 1998) (color photos depicting the victims

---

[71] J.T. at 99-100.

head wired together after sustaining a 20-gauge shotgun blast were inflammatory and lacked probative value as the defendant never contested the death was not homicidal).

After careful consideration, this Court determined that the autopsy photographs would assist the Commonwealth's witness, Dr. Lukasevic, in describing the nature of the wounds suffered, as well as explaining how he determined the entrance wound indicated the muzzle of the firearm was pressed tightly against the skin.

The seven photos clearly had probative value, as they assisted Dr. Lukasevic in explaining the nature of the wounds, which included a description of the entrance wound which indicated the muzzle of the firearm was pressed tightly against the skin. Although Appellant did not contest that Dane Taylor shot and killed Ms. Davis while robbing her of money, the photos were evidence that assisted Dr. Lukasevic in explaining the trajectory of the bullet through her body and the level of incapacitation that prevented her from offering any further resistance.

Three photographs depicted only clothing that had been removed from the victim and the location of the bullet hole and only a small amount of blood.[72] These photographic exhibits were not inflammatory and were admissible relevant evidence. The remaining four autopsy photographs did not display her face or head and the genitalia region was blacked out.[73] Two of these photographs were close-up images of the entrance wound to the left hip without depicting any other part of the body.[74] The Court did not deem these inflammatory and determined that they were probative. The last two photographs which showed the victim from the mid-torso to the mid-thigh, were potentially inflammatory as they displayed the abdominal area where organs had been removed. To minimize any impact, the Court instructed the Commonwealth to crop

---

[72] J.T. at 101; Commonwealth Exhibits 35-37.
[73] J.T. at 102, 121.
[74] J.T. at 121; Commonwealth Exhibits 33 and 34.

17

out the torso so that only the victim's lower waist and leg area were visible relevant to the location of the entrance and exit wound.[75]

Additionally, the Court provided the following cautionary instruction to the jury contemporaneously with the admission of the exhibits:

> So, Ladies and Gentleman, these particular photos are being admitted into evidence for the purpose of showing the nature of the wounds that were received by Ms. Davis and to aid the doctor in explaining what he found to you. Several of the photographs may not necessarily be pleasant to look at. But I caution you, you should not allow that to stir up emotions or prejudice in any way. Any verdict you ultimately reach in this case must be based on factual and fair consideration of all of the evidence and not on any passion or prejudice against the Defendant, Commonwealth or anyone else connected with this case. The purpose of the photographs is limited, and you should consider them only for that purpose and not for any other.[76]

While five of the seven admitted photos contained were not deemed inflammatory, the Court took measures to minimize the inflammatory effect of the other two photographs. The Court had portions of both photos cropped to exclude the abdominal cavity and only depict the lower body where the entrance and exit wounds were located. Additionally, a limiting instruction was given to the jury prior to showing the photographs.[77] The instruction explained the purpose of showing the photographs and explained to the jury they should not let the photos stir their emotions.

Here, the probative value of the above described photographs outweighed the prejudicial value in light of the protective measures and precautionary instruction to the jury, which served to minimize that impact. Thus, the Court did not abuse its discretion in admitting the photographs into evidence.

---

[75] J.T. at 122; Commonwealth Exhibit 31 and 32.
[76] J.T. at 226-227.
[77] J.T. at 226-227.

Appellant's second evidentiary issue is that the court erred when it excluded evidence of statements allegedly made by co-defendant Dane Taylor to a fellow inmate, David Tyus. Appellant claimed this evidence was admissible as a statement against Taylor's penal interest pursuant to Pa.R.E. 804(b)(3).

The rules of evidence provide in pertinent part as follows:

**Statement Against Interest** – A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declaration to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Pa.R.E. 804(b)(3).

At trial, the Court conducted an evidentiary hearing outside the presence of the jury. Appellant sought to call Dane Taylor to question him about statements he purportedly made to inmate David Tyus that were exculpatory as to Appellant.[78] Alternatively, Appellant offered testimony from David Tyus regarding any conversations he had with Taylor at the Allegheny County Jail relative to Appellant's participation. The Commonwealth sought to exclude the proposed testimony on the basis that it was not against Taylor's penal interest, and it did not contain sufficient indicia of reliability as there were no corroborating circumstances that would indicate the trustworthiness of the statement.[79]

---

[78] Taylor asserted his Fifth Amendment privilege through counsel, Marco Attisano, and thus was deemed by the parties and the Court to be unavailable pursuant to Pa.R.E. 804(b)(3). At the time of Appellant's trial Taylor had a pending PCRA petition wherein he sought to withdraw his plea of guilty to Third Degree Murder, Robbery, and Criminal Conspiracy due to alleged ineffective assistance of counsel. The petition was subsequently denied following an evidentiary hearing on February 17, 2022. No appeal has been filed.

[79] Commonwealth Motion in Limine filed on August 18, 2021.

19

Tyus testified that in 2018 he was cellmates with Dane Taylor who he referred to as "Gusto".[80] He stated that Taylor wrote down his "life story" and an explanation of what occurred during the robbery and shooting indicating that Appellant had no intent to rob the victim in the case.[81] Taylor asked him to get this note to Appellant. Tyus explained that he did not know Appellant or Ms. Davis at the time Taylor relayed this information to him.[82] Tyus switched pods in the Allegheny County Jail and was placed near Appellant.[83] He further explained that although Taylor had provided him this handwritten note with his life story and an explanation of how Appellant was not involved with the robbery, he nevertheless threw the note away because it was several months before he actually located Appellant on the pod.[84]

Tyus further explained that at some time later Taylor authored a second note and gave it to Tyus. He then provided this second note to Appellant, but the defense was unable to produce it at the evidentiary hearing.[85] He then claimed he wrote a four page letter detailing what Taylor had told him in August of 2018 and mailed it to Appellant's mom.[86] Appellant sought to have Tyus testify to the substance of what was in the letter, that in fact Taylor told him that he was solely responsible for robbing and killing Ms. Davis, and that Appellant was unaware of the robbery plan.

An accused has a fundamental right to present defense evidence so long as it is relevant and not excluded by an established rule of evidence. *Commonwealth v. Seibert*, 799 A.2d 54, 67 (Pa. Super. 2002). In this instance, before the hearsay statement of what Taylor told Tyus can be

---

[80] J.T. at 493–494.
[81] J.T. at 494.
[82] J.T. at 495.
[83] J.T. at 497.
[84] J.T. at 497-498.
[85] J.T. at 498-500.
[86] J.T. at 491-493. The letter was admitted for purposes of the hearing as Defendant Exhibit A. No evidence was presented to establish when in fact the note was written by Tyus.

20

admitted under Rule 804(b)(3) it must be shown the statement was made under circumstances that provide considerable assurance of its reliability. *Commonwealth v. Colon*, 846 A.2d 747 (Pa. Super 2004). In addition, any statement would need to actually be against the penal interest of the individual who purportedly uttered it. Our Supreme Court has held that a confession or statement which exculpates a declarant's accomplices is not a statement against interest because it does not subject the declarant to any additional crime or punishment. *Commonwealth v. Colon*, 337 A.2d 554, 558 (Pa. 1975).

The reliability of a declarant's statement that is arguably against penal interest may be established through the circumstances in which the statement was given. See *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, another person confessed multiple times to a murder for which Chambers was standing trial. This person confessed to three known associates shortly after the murder and explained he had fired the gun that killed the victim. He further gave a sworn confession to attorneys who were representing Chambers. The trial court excluded each statement and the United States Supreme Court held the Due Process Clause of the United States Constitution requires a defendant be afforded the right to present such evidence if the statements are made under circumstances that provide considerable assurance of their reliability. 410 U.S. at 300. The Supreme Court found an assurance of reliability in *Chambers* as follows:

> Each of (confessor's) confessions was made spontaneously to a close acquaintance shortly after the murder occurred. Second, each one was corroborated by some other evidence in the case....Third, ... each confession here was in a very real sense self-incriminatory and unquestionably against interest. Finally, if there was any question about the truthfulness of the extrajudicial statements, (the confessor) was present in the courtroom and was under oath.

*Id*. at 300-301.

Based on the above circumstances, the Supreme Court found the mechanistic application of Mississippi's rules of evidence deprived Chambers of his right to due process of law.

21

In the case *sub judice*, there are no assurances of reliability to the jailhouse statement Dane Taylor made to fellow inmate David Tyus. There is no corroborative evidence to establish the reliability of the statement, and in fact both alleged statements authored by Taylor himself were no longer available. The statement was made while Taylor was incarcerated and not spontaneously shortly after the robbery and homicide. There is nothing self-incriminatory and unquestionably against interest about a statement that seeks to exculpate Appellant from participation in the robbery of Ms. Davis. Taylor would not have been subject to examination under oath about any claim that Appellant did not participate in the robbery. Tyus would simply have taken the witness stand and offered an uncorroborated hearsay statement made by Taylor seeking to exculpate Appellant. As the proposed testimony is a far different factual scenario from the type offered in *Chambers* (both in its lack of assurance of reliability and its failure to qualify as a statement against the declarant's interest), this Court did not err in excluding it pursuant to Pa.R.E. 804(b)(3).

## SUFFICIENCY OF THE EVIDENCE

The applicable standard for assessing a challenge to the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Johnson*, 236 A.3d 1141, 1151-1152 (Pa. Super. 2020). The Commonwealth is not burdened with precluding every possibility of innocence. *Commonwealth v. Shaw*, 203 A.3d 281, 284 (Pa. Super. 2019). Moreover, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Id.* When the evidence is circumstantial rather than

22

direct, it is sufficient when a combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995).

In accordance with the above standard, it is necessary to review the relevant statutory law with respect to Appellant's arguments that the evidence was insufficient to sustain his convictions for conspiracy, robbery, second-degree murder, and tampering with evidence.

## CONSPIRACY TO COMMIT ROBBERY

Conspiracy is defined in 18 Pa.C.S. § 903, in relevant part, as follows:

(a) Definition of conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
   (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
   (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime....
(e) Overt Act. No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903.

The Court in *Commonwealth v. Lambert*, 795 A.2d 1010 (Pa. Super. 2002), thoroughly discussed the necessary components to establish conspiracy.

A conviction for criminal conspiracy, 18 Pa.C.S.A. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1030 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997), *citing* 18 Pa.C.S.A. § 903.

The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. *Commonwealth v. Keefer*, 338 Pa. Super. 184, 487 A.2d 915, 918 (1985). Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. *Id.* Rather,

23

the Commonwealth must prove that the defendant shared the criminal intent, *i.e.*, that the Appellant was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." *Hennigan*, 753 at 253. The defendant does not need to commit the overt act; a co-conspirator may commit the overt act. *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa. Super. 1998) (*en banc* ), *appeal denied*, 559 Pa. 689, 739 A.2d 1056 (1999).

A conspiracy is almost always proved through circumstantial evidence. *Commonwealth v. Swerdlow*, 431 Pa. Super. 453, 636 A.2d 1173, 1176 (1994). "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Johnson*, 719 A.2d at 785. The evidence must, however, "rise above mere suspicion or possibility of guilty collusion." *Swerdlow*, 636 A.2d at 1177 (citation omitted).

This Court has identified factors to be considered:

Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred. *Commonwealth v. Carter*, 272 Pa. Super. 411, 416 A.2d 523 (1979).

*Commonwealth v. Olds*, 322 Pa. Super. 442, 469 A.2d 1072, 1075 (1983). *See also, Commonwealth v. Azim*, 313 Pa. Super. 310, 459 A.2d 1244 (1983).

Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. *Commonwealth v. Stocker*, 424 Pa. Super. 189, 622 A.2d 333, 342 (1993). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. *Commonwealth v. Soto*, 693 A.2d 226, 229–230 (Pa. Super. 1997), *appeal denied*, 550 Pa. 704, 705 A.2d 1308 (1997). *See also*, 18 Pa.C.S.A. § 306.

The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy

24

regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

*Commonwealth v. Galindes,* 786 A.2d 1004, 1011 (Pa. Super. 2001).

The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the sine qua non of a conspiracy."

*Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456, 463–464 (1998), *cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999) (citations omitted).

*Lambert,* 795 A.2d at 1016-1017.

A review of the record in the light most favorable to the Commonwealth supports that there was an agreement between Appellant and Dane Taylor that he would assist him in the robbery of Keiauna Davis. Phone records showed that Appellant and Taylor began communicating shortly after Whitley informed Taylor about the money Ms. Davis brought to work. Thereafter, Appellant drove Taylor to the Dollar General where Ms. Davis was ending her shift. He and Taylor waited for her to exit the store before pulling out of the parking lot and following her onto Laketon Avenue. At this time Appellant is aware that Taylor, who was now wearing a ski mask, was armed with a firearm. Appellant positioned the car in advance of Ms. Davis, who was walking on the sidewalk. Appellant pretended to examine his car as a ruse so that Taylor could jump out of the car as Ms. Davis approached Appellant's vehicle. Appellant remained at the vehicle within feet of the entire incident and watched as Taylor physically struggled with Ms. Davis over her purse. After hearing gunshots, Appellant never left he perimeter of the car and only re-entered the car once Taylor gained control of the purse. Appellant then removed the money from the purse and threw it out the open passenger door as Taylor returned to the scene to retrieve his dropped phone. Appellant then drove away from the scene with Taylor and hours later drove Taylor to Whitley's house. Facebook records submitted

25

at trial showed on-going communications with both Taylor and Whitely after the robbery and Appellant's girlfriend provided police with nearly $700 from the $3,000 stolen from Ms. Davis.

Thus, the evidence viewed in the light most favorable to the Commonwealth, as verdict winner, showed an association between Appellant and Taylor as well as Appellant's knowledge that Taylor intended to rob the victim. Testimonial and video evidence confirmed Appellant's presence at the scene of the crime and that he aided Taylor by driving him to commit the robbery and providing his subsequent escape.

Appellant argues that this case is similar to *In the Interest of J.B.*, because this same evidence, even when viewed in the light most favorable to the Commonwealth, is equally consistent with his innocence. That is simply belied by the record and was rejected by the jury who was presented with, and instructed on, the defense of duress as offered through Appellant's testimony.

Appellant offered an alternative explanation for the phone records and video surveillance which unquestionably demonstrated a connection to Taylor and his presence during the commission of the crime. Appellant offered that he became an unwilling participant after providing Taylor a jitney ride. He testified that he acted out of fear that he or his family members would be shot based on threats made by Taylor. However, the video evidence does not show that Taylor ever directed the gun at Appellant. The entire incident transpired in less than one minute. During this brief time, Appellant's movements are slow and deliberate and in concert with Taylor and not consistent with someone under threat, or unaware of what was happening, or that he was acting under the direction of Taylor. Moreover, Appellant continued his association with Taylor after the robbery and murder, including driving him to Whitley's house and messaging with him over a period of eighteen hours, referring to Taylor as "bro",

26

"homie", and "cuhs". During these messages Appellant made disparaging comments about Ms. Davis and discussed going out with Taylor that night. Additionally, Appellant's nine-hour interview with police demonstrated that he was less than forthcoming regarding his knowledge and involvement in the robbery and his association with Taylor and Whitley.

Appellant's argument that his testimony, which served to prove that he acted under duress, and was thus equally supportive of his innocence, is without merit. A jury could conclude beyond a reasonable doubt that Appellant was aware that Taylor planned to rob Ms. Davis of her money and that Appellant agreed to act as his driver to aid in the commission of that crime.

## **ROBBERY**

In his Statement, Appellant contends that the Commonwealth's evidence was insufficient to support a finding that he aided Dane Taylor in the commission of the Robbery.

As charged, a person is guilty of robbery as defined in 18 Pa.C.S. § 3701 if:

(a) Offense defined
 (1) A person is guilty of robbery if, in the course of committing a theft, he:
  (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;
 (2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 Pa.C.S. §3701(a)(1) and (2).

As offered in more detail above, the video evidence unquestionably established that Dane Taylor robbed Keiauna Davis of her purse and money. Additional evidence demonstrated that Appellant agreed to take part in the robbery, and in fact aided Taylor by driving him to and from the scene. As a co-conspirator, Appellant is responsible for the actions of his co-conspirator

27

taken in furtherance of the conspiracy. A person who is guilty of conspiracy involving an accomplished robbery is necessarily guilty of the robbery itself.

## MURDER OF THE SECOND DEGREE

Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S. § 2502(b). Perpetration of a felony is further defined as:

> [t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A § 2502(d).

> A person is legally liable as an accomplice when:

> (1) With the intent of promoting or facilitating the commission of the offense, he: ...
>     (ii) aids or agrees or attempts to aid such other person in planning or committing it; ...

> (d) Culpability of accomplice.—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S.A. §§ 306(a), (b)(3), (c)(1)(ii) and (d).

Appellant argues that the evidence was insufficient to convict him of second-degree murder because the Commonwealth failed to establish a conspiracy with Taylor or that he acted as an accomplice. For the reasons stated above in the Court's analysis of the conspiracy charge this claim is without merit.

Regarding Appellant's claim that the evidence was insufficient to establish that he was an accomplice to the felony murder, the court again looks to the holding in *Lambert.*

28

The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. Rather, the fact finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking.

*Lambert*, 795 A.2d 1010, 1023 (internal citations omitted).

The *Lambert* court also discussed the resulting legal responsibility of an accomplice:

The very nature of accomplice liability is that one who actively and purposefully engages in criminal activity is criminally responsible for the criminal actions of his/her co-conspirators which are committed in furtherance of the criminal endeavor. [M]ere presence at the scene is insufficient to support a conviction: evidence indicating participation in the crime is required.

*Lambert*, 795 A.2d at 1024 (internal citations omitted).

The Court finds the holding in *Commonwealth v. Pone*, 251 A.3d 1265 (Pa. Super. 2021) (non-precedential) persuasive.[87] The facts and evidence in *Pone* are strikingly similar to the facts *sub judice*. Pone was convicted of second-degree murder, robbery, and conspiracy wherein evidence at trial established that he traveled to the robbery scene aware that his two co-conspirators were going to rob someone. Pone laid in wait for the victim to arrive, entered the business where the robbery was to occur, and prevented a third party from interceding during the robbery. It was during the robbery that the victim was shot and killed by a co-conspirator. Surveillance footage captured Pone and the two other actors arrive in advance of the victim. Additional footage of the robbery and shooting confirmed that Pone participated in the assault the victim and physically blocked a third party from intervening. Pone is also seen following the

---

[87] A non-precedential case decided after May 1, 2019 may be cited for its persuasive value. Pa.R.A.P. 126(b).

third party outside and whereafter he leaves in a car operated by the third co-conspirator. During the police investigation, all three actors provided inculpatory statements. Pone challenged the sufficiency of the evidence for his conviction for second-degree murder under two theories.

First, that he was not physically present at the time the victim was killed, and second that he abandoned the conspiracy. Pone's convictions were affirmed on appeal, with the Court having concluded that he was liable as an accomplice. The Pennsylvania Superior Court noted that "absence or presence at the scene" is a factor, and not dispositive, regarding accomplice liability. *Pone*, 251 A.3d 1265, citing *Commonwealth v. Gross*, 101 A.3d 28,35 (Pa. 2014). Second, the facts supported that Pone's conduct aided in the commission of the underlying robbery, and specific to his claim, found that he took no actions to abandon the conspiracy.

Here, Appellant drove Taylor to the scene, waited during the commission of the robbery, and enabled his flight afterwards. As discussed above, the Court found this evidence sufficient to support a jury's conclusion that Appellant aided Taylor in the robbery of Ms. Davis. Appellant drove Taylor to the victim's workplace and waited in the parking lot for her to leave. Appellant then drove past Ms. Davis as she walked home and positioned his car in advance of her. In furtherance of this crime, Appellant created a ruse to facilitate Taylor's surprise attack on the victim. The video, which served as direct evidence of the robbery, unmistakably showed that Taylor began a physical struggle with Ms. Davis over her purse. Taylor shot at Ms. Davis, not once, but twice during this struggle. It was the second and subsequently fatal gunshot that allowed Taylor to physically overcome her and complete the robbery by taking the purse. Appellant waited outside the vehicle, watched the robbery and the shooting, took the money from Ms. Davis's purse, and drove Taylor away from the scene. Thus, Appellant was more than merely present at the scene of the crime. Legal precedent has held that culpability for murder is

30

not limited to the killer in cases of felony murder but is imputed to "all participants in the felony, including the getaway driver." *Lambert* A.2d at 1023. Here, the evidence is sufficient that Appellant participated and aided Taylor, and therefore, he is legally responsible as an accomplice for Taylor's crimes, which included the murder of Keiauna Davis.

## TAMPERING WITH PHYSICAL EVIDENCE

In his last sufficiency claim, Appellant alleges that the Commonwealth's evidence failed to prove that he intended to impair the availability of any items for the investigation.

Tampering with physical evidence is defined in 18 Pa.C.S. § 4910, in relevant part, as a person who believing that an official proceeding or investigation is pending or about to be instituted: "alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation." 18 Pa.C.S. § 4910(1).

Appellant's actions, which were captured on video, show him throw the victim's purse out the open passenger door and into a nearby tree. The sequence of the events leading up to, during and after Appellant's act supports the jury's verdict that he discarded the victim's purse with the intent to prevent its accessibility for any future investigation. No less significant were Appellant's own words at trial, wherein he explained that he threw the purse to get rid of it because he was concerned it may have had his DNA and/or fingerprints on it.[88]

Therefore, after viewing all the evidence admitted at trial in the light most favorable to the verdict, the evidence was sufficient to support the conviction for tampering with evidence.

---

[88] J.T. at 409-410.

## WEIGHT OF THE EVIDENCE

A challenge as to the weight of the evidence, "concedes that sufficient evidence was adduced to convict the defendant but that the verdict must nevertheless be overturned because the evidence was untrustworthy and unreliable." *Commonwealth v. Gaskins*, 692 A.2d 224, 228 (Pa. Super. 1997).

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [fact-finder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [factfinder's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Landis*, 89 A.3d 694, 699 (Pa. Super. 2014) (citation omitted).

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Brown, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (Pa.1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321–22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not

exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013).

It is this Court's position that this claim is waived for vagueness. Appellant's claim does not specify which evidence over the course of the four-day trial which included: eleven witnesses and sixty-one exhibits from the Commonwealth, and four witnesses and four exhibits from the defense, deserved little or no weight. Furthermore, even in its most generous interpretation, this claim as framed is irrelevant to the charge of tampering with evidence, which Appellant includes in his request for a new trial. Moreover, even if the Court were to read Appellant's post-sentence motion in tandem with the Concise Statement, the Court is left without an understanding of Appellant's weight claim. This is because the claim as raised in the post-sentence motion conflates sufficiency of the evidence and weight. As noted above, a weight claim concedes that the evidence was sufficient. However, in the Appellant's post-sentence motion he argued that the verdicts were against the weight of the evidence *because* the Commonwealth offered "scant" evidence and/or there was a "lack of evidence" of a conspiracy. Attacking the quantity of the evidence is contrary to a concession that the evidence was sufficient. Thus, the Court is in no better position to assess Appellant's weight claim even with the benefit of the previous motion that was designed to preserve the claim. See *Commonwealth v. Rogers*, 250 A.3d 1209 (Pa. 2021) (Pennsylvania Supreme Court held that an appellant's weight claim was not waived for vagueness at the intermediary level, when, despite the exceedingly brief nature of the concise statement, the post-sentence motion articulated the evidentiary-weight claim at some length, such that the trial level court was able to address the claim in its opinion.)

33

To the extent that this is reviewable on the merits, the record does not support that the court abused its discretion when it denied Appellant's request for a new trial. The Commonwealth's evidence was both direct and circumstantial in demonstrating Appellant's participation in the robbery that led to the senseless death of Ms. Davis. That Appellant was not the trigger man nor responsible for the actual robbery of Ms. Davis is irrelevant to the verdict of murder of the second degree as he is equally liable as an accomplice and as a co-conspirator of the robbery.

The jury had an opportunity to fairly assess the credibility of all the witnesses and evidence, including Appellant's videotaped police interview wherein he repeatedly made false claims regarding his knowledge and participation. It is important to reiterate that the Appellant did not dispute his participation in this crime, as the majority of it was captured on video. Thus, the jury was presented with two different versions for his actions, Appellant's and the Commonwealth's. As stated above, the factfinder is free to believe, all, some, or none of the evidence. The jury simply rejected Appellant's testimony that he acted under duress while under threat from Dane Taylor, in light of the credible evidence produced by the Commonwealth. "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Mikitiuk*, 213 A.3d 290, 305 (Pa. Super. 2019) citing *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015). The record does not support such a conclusion.

For all the reasons stated in this Opinion, the judgment of sentence should be AFFIRMED.

34